## In re Bessie D. Bremer.

*Husband and wife—Feme sole trader—Right of wife to be so decreed—Acts of May 4, 1855, and May 28, 1915, distinguished.*

1. Under the Act of May 4, 1855, P. L. 430, desertion by the husband or his neglect or refusal to support the wife from drunkenness, profligacy or other cause entitled her to be decreed a *feme sole* trader; but under the Act of May 28, 1915, P. L. 639, a living apart for a year, during which time all marital relations have ceased and the husband has failed to support the wife, entitles her to relief. Separation and non-support, as distinguished from desertion, are the conditions precedent to enjoyment of the benefits of the later act.

2. A wife, who was possessed of a separate estate, requested her husband to leave their common domicile because of his alleged attentions to other women. He packed up and left. Thereafter he contributed nothing toward her support, although she made a formal demand upon him. Some years afterwards she filed a petition to be decreed a *feme sole* trader: *Held*, that the petition should be granted.

Graver's Petition, 260 Pa. 186, distinguished.

Petition to be decreed a *feme sole* trader. C. P. No. 1, Phila. Co., Dec. T., 1922, No. 8126.

*Joseph L. Kun*, for petitioner; *Edgar S. McKaig*, contra.

McDevitt, J., Oct. 9, 1923.—Petitioner and respondent were married on Nov. 12, 1901, and resided together until Jan. 21, 1919, when respondent was requested by petitioner to leave their common domicile because of alleged misconduct on his part. On Jan. 29th of the same year, the request was complied with and respondent moved.

Until Dec. 11, 1922, petitioner continued to live at Merion, and subsequent to that date has resided in the City of Philadelphia. On Jan. 12, 1923, petitioner made demand in writing upon respondent for support. To date, respondent has not responded.

The petitioner is now before the court praying to be declared a *feme sole* trader, in order that her property shall be subject to her free and absolute disposal without interference from her husband. Respondent objects to the petition on the ground that petitioner deserted him and has refused to resume marital relations.

Respondent's only right to object to petitioner being declared a *feme sole* trader is the fact that it robs him of his right of tenant by curtesy, which he contends is a vested right in the property of his wife. This raises the question of the duties arising out of the marriage contract and the civil rights of a female.

Marriage is recognized by all civilized nations as a peculiar and favored contract. In its origin, it is a contract of natural law, but it is something more than a mere contract. It is accepted as an institution of society founded upon the consent and contract of the parties, and in this respect it has some peculiarities in its nature, character and extent of obligation, totally different from what belong to ordinary contracts. It is the parent and not the child of society. In civil society, it is a civil contract, regulated and prescribed by law and endowed with civil consequences. Where it has had the sanction of religion superadded, it becomes a religious as well as a natural and civil contract; but it is error to suppose that because it is the one, it cannot likewise be the other.

Unlike other contracts, it cannot, among civilized nations, be dissolved by mutual consent. The rights, duties and obligations arising from so important a relationship cannot be left to the discretion or caprice of the contracting parties, but are matters of so much importance to the best interests of

In re Bessie D. Bremer.

morality and the well-being of the state that they must be regulated, not by private contract, but by the public laws of the state, which are imperative and equally applicable to all.

Tenancy by curtesy came down from the common law curtesy, in which four requisites were necessary to establish it, namely, marriage, seisin of the wife, issue and death of the wife. Curtesy arose in common law on the theory that the surviving husband was the natural guardian of the child, and as such was entitled to the profits of the lands of his wife in order to maintain it. As soon, therefore, as a child was born, the father began to have a permanent interest in the lands, and this estate, once vested in him by the birth of the child, was not terminated by the subsequent death or coming of age of the infant.

Until recently, females were without political rights. They had no part or lot in the formation or administration of government. They could neither vote nor hold public office. They contributed their share in the form of taxes to the support of government, but were allowed no voice in its management. They were subject to the discipline of the law, but allowed no share in making it. The rights of a single woman were superior to those of married women; in fact, excepting political rights, almost equal to a man's. She could make the same contracts and perform the same legal acts until she married, when she automatically destroyed many of her civil rights. The merging of the name of the female with that of the male in the marriage contract was emblematic of the fate of her legal rights, the theory being that marriage made the husband and wife one person, and that one person the husband. At present, the husband is liable for such necessaries as his wife may require, and in this respect she may contract debts which he must pay. The law, however, has not advanced so far that woman has acquired rights so similar to man's that the husband may charge his necessaries to her account or incur debts for which she is legally liable.

In fact, in the case of intestates, the law has sought to protect the deceased wife's property where her husband had deserted or failed to support her for at least a year before her death. The protection is identical after death with that provided by the Feme Sole Traders Act during the woman's life.

The Intestate Act of June 7, 1917, P. L. 429, in section 5, reads as follows: "No husband who shall have, for one year or upwards previous to the death of his wife, wilfully neglected or refused to provide for his wife, or shall have for that period or upwards wilfully and maliciously deserted her, shall have the right to claim any title or interest in her real or personal estate after her decease, under the provisions of this act."

Neglect or refusal to provide for his wife, and wilful and malicious desertion for a period of one year or upwards, disqualifies the husband from asserting his right of curtesy. Under the earlier statutes, the courts recognized that the specified derelictions of the husband were separate and distinct, and that if either of the said causes—desertion or non-support—were pursued throughout the statutory period, it was sufficient in law to debar all rights of the husband: White's Estate, 188 Pa. 633; Shaw's Estate, 54 Pa. Superior Ct. 444; Kvist's Estate, 256 Pa. 30.

Bremer is guilty of neglect and refusing to provide for his wife. Therefore, by his own conduct, he would have forfeited his rights of tenant by curtesy under the Intestate Act.

Respondent should not confuse the ground necessary to procure a divorce with the conditions required under the Act of 1915 to be declared a *feme sole* trader. They are separate and distinct and easily distinguishable. The

3 D. & C.

### In re Bessie D. Bremer.

respondent by his attitude strikes at the heart of society's most sacred safeguard—marriage, its rights, duties and obligations. He violates every tenet of manhood and American ideals when he assumes that he is entitled to support at the hands of his spouse. Even though women had not shaken off the shackles of slavery that bound them to medieval customs and merged their personalities and rights in those of their spouses, they never occupied such a secondary place in this community that they must sacrifice their most treasured possession—self-respect; nor that the stronger of the species, universally accepted as her helpmate, might lead a life of ease and comfort without exertion or anxiety. Wives are not for sale in private nor on the auction block. Those who see fit to better the condition of their husbands must not submit to ignominy and insult because they have been tolerant for years. Female patience even has its limitations. There is no law and no custom that justifies a male in deserting his means of livelihood because his wife happens to be the daughter of a wealthy father. Titles and genealogical tables are not for sale in this country in return for maintenance, and the time is not ripe for men—worthy of the name—to insist upon support by their wives because they occupy social position or contribute the favor of their name and the pleasure of their company to a female.

If respondent is convinced that he is entitled to his vested right by the curtesy initiate in his wife's possessions, why should he not also assume that the Domestic Relations Branch of the Municipal Court would grant him a hearing and, perhaps, issue an order of support upon petitioner?

In his letter of February, 1919, he asked petitioner: "Do you realize what you are doing? I have no place to go and no means," and that almost eighteen years after having taken her as his wife.

The whole framework of society's morale will be destroyed if fortune hunters are to be encouraged in seeking heiresses, and, if successful, they be permitted to bask in the sunshine of ease and comfort—so long as they do not run afoul of the divorce laws—content in the knowledge that their wives cannot alien their own property without their knowledge and consent.

While no man should be condemned unheard, at the same time acts indicate intentions. By Bremer's own admissions, he never supported the petitioner, and, when requested to seek another habitat, acquiesced and promptly rendered a statement of account to his wife, the petitioner, for expenditures made in supporting and entertaining her during upwards of eighteen years that they cohabited. He offered no resistance to moving his few personal effects from their common domicile, the property of petitioner. On the contrary, he packed his own trunks. Does not his acquiescence when he might have refused to vacate their common home obviate its effect? Can that to which he assented now be construed an injury or injustice?

While the law in its executive capacity will not work a wrong, at the same time, laws are adapted to those cases which most frequently occur, and regard must be had for the public welfare in the construction and enforcement of all laws. Inasmuch as a litigant, who alleges things contradictory to each other, is not entitled to be heard, why should one be permitted to take advantage of his own wrong? How can Bremer expect the court to believe that his offer to resume marital relations and support his wife in January, 1919, is *bona fide*, if during the previous eighteen years he failed to perform his duty—as generally construed by society—and has not tendered support since formal demand was made for the same in January, 1923, four full years after departing from Merion? If his feelings have been outraged and his rights transgressed by his wife's alleged desertion and non-support, why has he not

availed himself of his legal remedies? While there is no wrong without a remedy, at the same time, usage is the best interpreter of things, and respondent apparently thought more of his assured livelihood without physical effort or mental anxiety than he did of his position in the community and the conventions of society.                                                        \

The Act of May 28, 1915, P. L. 639, provides: "That whenever a man and wife live apart and separate for one year or more, and all marital relations between them have ceased, and the husband for one year or more has not supported his wife, nor their child or children, if any they have, from the time of the separation of the husband and wife, and the wife and child, or children, if any there are, are maintained either by the wife, by the joint efforts of the wife and children, by the children, or from the income of the wife's separate estate, then in such case the wife may petition the Court of Common Pleas of the county in which she resides to be decreed a *feme sole* trader. . . ."

The former Act of May 4, 1855, P. L. 430, provided, section 2: "That whensoever any husband, from drunkenness, profligacy or other cause, shall neglect or refuse to provide for his wife, or shall desert her, she shall have all the rights and privileges secured to a *feme sole* trader under the Act of Feb. 22, 1718, entitled 'An act concerning *feme sole* traders,' and be subject as therein provided, and her property, real and personal, howsoever acquired, shall be subject to her free and absolute disposal during life, or by will, without any liability to be interfered with or obtained by such husband, and in case of her intestacy shall go to her next of kin as if he were previously dead."

The Act of 1855, in directing procedure, states in section 4: "She may present her petition to the Court of Common Pleas of the proper county, setting forth, under affidavit, the facts which authorize her to act as aforesaid, and if sustained by the testimony of at least two respectable witnesses, and the court be satisfied of the justice and propriety of the application, such court may, upon such notice as they may direct, make a decree and grant her a certificate that she shall be authorized to act, have the power and transact business as hereinbefore provided. . . ."

The Act of 1915, in directing procedure, provides: ". . . the wife may petition the Court of Common Pleas of the county in which she resides to be decreed a *feme sole* trader; and if it thereupon appear, upon proof presented, that the wife and husband have been living separate and apart for one year or more, that the husband has not supported nor contributed toward the support of his wife, and that the wife by her own industry, or the joint industry of herself and her children, or by reason of an income from her own estate, has maintained herself or been maintained by her children, then in every such case the wife shall be declared a *feme sole* trader. . . ."

The distinction in the acts is clear, both with regard to the conditions necessary to entitle a female to relief and the proof required.

In the early act, neglect or refusal to support a wife on account of drunkenness, profligacy or other cause, or desertion, entitled the female to such relief.

In the later act, a living apart for a year, during which time all marital relations have ceased, and the husband has failed to support his wife, entitles the latter to seek relief.

In construing acts of assembly, words of common usage are to be understood in their natural, plain, ordinary and genuine signification, as applied to the subject-matter of the enactment. The legislature must be intended to mean what it has plainly expressed, and, consequently, there is no room for construction. While courts are not to mould the language of statutes in order

3 D. & C.

### In re Bessie D. Bremer.

to meet an alleged convenience or an alleged equity; are not to be influenced by any notion of hardship or of what in their view is right and reasonable or prejudicial to society; are not to alter clear words, though the legislature may not have contemplated their consequences; are not to tamper with words for the purpose of giving them a construction which is supposed to be more consonant with justice than their ordinary meaning; at the same time, where clear and unequivocal language capable of only one meaning is used by the legislature, it must be enforced, even though it be absurd or mischievous. If the words go beyond what was probably the intention, effect must, nevertheless, be given to them. They cannot be construed contrary to their meaning as embracing or excluding cases merely because no good reason appear why they should be excluded or embraced. However unjust, arbitrary or inconvenient the intention conveyed may be, it must receive its full effect. It is the court's duty to interpret, not improve, acts of assembly. The intent of the legislature is to be ascertained by means of the words which it has used. The real test is what the language adopted by the legislature means, not what the legislature meant.

In Graver's Petition, 260 Pa. 186, the Supreme Court held: "The failure of the husband to support his wife, as contemplated by the act, must be such as to constitute a breach of duty on his part." But in applying this to the case at bar, consideration must also be given to the doctrine that a person cannot take advantage of his own wrong or shortcoming to gain a favorable interpretation of the law. Because respondent had never been called upon to support petitioner in the manner in which she had been accustomed to live did not excuse him from contributing such support as he could afford. Were the act to be construed to mean that the petitioner must be in want because of the cutting off of respondent's support, then it belongs to the domestic relations class.

The facts in Graver's Petition must not be confused with those in the present case.

In the former, petitioner employed deception to leave the common domicile and removed to another state before having her agents notify respondent that he was to vacate their former common domicile—her mother's home. She left the house presumably to take her accustomed morning motor ride and entrained for New York. There was—as far as the record shows—no altercation, no disagreement and no reason for the sudden departure.

In the case at bar, petitioner objected to respondent's conduct with other women. In his depositions Bremer admits certain attentions that might be called flirtations or fascinations. Even though petitioner up to that time had been content to support herself and their home, she had not forfeited her right to demand the undivided attention and duty due a wife, even though the husband had not contributed to her adequate support up to that time. Condoning one shortcoming hardly gave respondent *carte blanche* to violate all the conventions of the marital state.

Acts dealing with the subject of *feme sole* traders were enacted, prior to 1915, for the purpose of permitting married women to carry on business in the absence of, originally, sea-faring husbands, and later deserters.

Since the Act of 1915, the intent of the act must be construed from the meaning of the words that constitute it, and these apply concisely to married women whose husbands are living separate and apart and not contributing to their support. Separation and non-support—not desertion—are the conditions precedent to enjoyment of the benefits of this act.

The petition is allowed and the following decree entered as of this date:

In re Bessie D. Bremer.

*Decree.*

And now, to wit Oct. 9, 1923, upon consideration by the court of the petition in support thereof, and it appearing that petitioner and her husband have lived separate and apart for a period of over four years, and that Howard B. Bremer, the husband of the petitioner, Bessie D. Bremer, has, during said separation, failed and neglected to support and maintain his said wife, and that the said petitioner has been maintained solely and exclusively from the income of her own separate estate, it is, upon motion of Sundheim, Folz & Kun, Esqs., attorneys for the petitioner, ordered and decreed that the said Bessie D. Bremer be and she is hereby declared to be a *feme sole* trader, and her property, real and personal, however acquired, shall be subject to her own free and absolute disposal during her life or by will without any liability to be interfered with or obtained by her said husband, Howard B. Bremer, and in case of intestacy, all of her property shall go to her next of kin as if her said husband were previously dead, according to the act of assembly in such case made and provided.